KATTY CALDERON, NATURAL MOTHER OF
THE DECEDENT, AVRIL SANABRIA

VERSUS

LEZLY SANABRIA, SULY SANABRIA,
JONATHAN RIVERA, ABC INSURANCE
COMPANY, DEF INSURANCE COMPANY,
AND GHI INSURANCE COMPANY

NO. 21-CA-579

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 87,453, DIVISION "D"
HONORABLE M. LAUREN LEMMON, JUDGE PRESIDING

May 04, 2022

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and John J. Molaison, Jr.

**REVERSED AND REMANDED**
    **FHW**
    **SMC**
    **JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR DEFENDANT/APPELLANT,
FAMILY SECURITY INSURANCE COMPANY AND UNITED PROPERTY
AND CASUALTY INSURANCE COMPANY

    H. Minor Pipes, III
    Alexis Polk Joachim
    Katherine S. Roth

COUNSEL FOR PLAINTIFF/APPELLEE,
KATTY CALDERON, NATURAL MOTHER OF THE DECEDENT, AVRIL
SANABRIA

    Pedro F. Galeas
    Scott LaBarre

**WICKER, J.**

Appellant-Defendant, Family Security Insurance Company, appeals the trial court's May 18, 2021 judgment denying its Motion for Summary Judgment and granting Appellee-Plaintiff, Katty Calderon, natural mother of decedent Avril Sanabria's Motion for Partial Summary Judgment on the Issue of Insurance Coverage. For the reasons discussed herein, we reverse the May 18, 2021 judgment and remand this matter to the district court.

**FACTUAL AND PROCEDURAL BACKGROUND**

This litigation arises out of the tragic death of two-year old Avril Sanabria ("Avril"), who remained secured in a car seat's harness in the rear of a vehicle that was parked in the residential driveway of 494 Carolyn Drive in Destrehan, Louisiana for over six hours, when the external temperature was ninety-seven degrees Fahrenheit. The underlying facts of this case are undisputed.

On October 4, 2019, Suly Sanabria ("Suly"), the decedent's paternal grandmother, drove to Walgreens located at the corner of Airline Drive and Clearview Parkway in Metairie, to pick up her daughter, Lezly Sanabria ("Lezly"), and her two-year-old granddaughter and Lezly's niece, Avril Sanabria ("Avril"). To safely transport Avril, a car seat had been installed in the rear of Suly's vehicle, and Avril was seated in it with the harness secured. Suly then drove Lezly and Avril to her residence located at 494 Carolyn Drive in Destrehan. Lezly lived in a small apartment, the mother-in-law suite, located behind the primary residence. When they arrived at the Destrehan home, Jonathon Rivera, Lezly's then boyfriend, was waiting for them in front of the house. Suly parked her vehicle in the driveway and entered her home alone, leaving Lezly, Jonathon and Avril at the car. According to Suly, she was unable to fasten or unfasten Avril in her car seat because of disabling arthritis in her hands. Lezly and Jonathan unloaded bags from the vehicle and proceed to Lezly's apartment in the rear of Suly's home.

Neither Suly nor Lezly removed Avril from the vehicle. More than six hours later, Suly and Lezly realized that neither of them had Avril. Upon returning to her vehicle, Suly discovered Avril was still in the vehicle. As a result, Avril sustained injuries to her mind and body that led to her death.[1]

On January 21, 2020, Katty Calderon, Avril Sanabria's natural mother, filed a wrongful death and survival action against Lezly Sanabria, Suly Sanabria, Jonathan Rivera, and three unknown insurance companies in the 29th Judicial District Court for the Parish of St. Charles.

On March 23, 2020, Ms. Calderon filed a First Supplemental and Amended Petition for Damages to add the proper names of the three insurance companies: (1) United Property and Casualty Insurance Company, who maintained a homeowner's policy issued to Suly Sanabria; (2) Family Security Insurance Company, a stock insurance company who was the underwriter for the homeowners' policy and an affiliate of United Property and Casualty Insurance Company; and (3) Allstate Insurance Company ("Allstate"), the liability insurer of the vehicle involved in the loss.[2] On June 25, 2020, United Property and Casualty Insurance Company and Family Security Insurance Company (jointly hereinafter "UPC") filed a Declinatory exception of *Lis Pendens* along with Answers to Ms. Calderon's Petition for Damages, and her First Supplemental and Amended Petition for Damages. Thereafter, on September 16, 2020, Suly filed an Answer to the petition and asserted a Third Party Demand against UPC. In reply, UPC filed a Declinatory Exception of *Lis Pendens* and an Answer to Suly's Third Party Demand on October 13, 2020.

On January 8, 2021, UPC filed a Motion for Summary Judgment on the issue of insurance coverage. Relying on a motor vehicle liability exclusion contained in

---

[1] In the criminal matter, Lezly pled guilty to negligent homicide for the death of Avril and was sentenced to three-years probation.

[2] UPC issued a homeowners' policy, policy no. ulf 00091040071 to Roberto Narez, Suly's husband, and Suly Sanabria for the policy period of July 10, 2019 to July 10, 2020 for the property located at 494 Carolyn Drive in Destrehan.

the homeowners' policy, UPC averred that Avril Sanabria's death arose "out of the occupancy," "use" and/or "unloading," of a motor vehicle, as well as the "failure to supervise and/or negligent supervision," of the child by Suly and Lezly involving a motor vehicle, which precluded coverage for any of Ms. Calderon's damages. Specifically, UPC argued that Suly's and Lezly's alleged liability arose out of four of the delineated instances in which liability, under the terms of the policy, is Motor Vehicle Liability such that no coverage exists under these facts. UPC's motion relied upon the following pertinent language contained in the policy:

### HOMEOWNERS 3 - SPECIAL FORM

**DEFINITIONS**
B. In addition, certain words and phrases are defined as follows:

1. Motor Vehicle Liability, subject to the provisions in **b.** below, means the following:

a. Liability for "bodily injury" or "property damage" arising out of the:

(1) Ownership of such vehicle or craft by an "insured";
(2) Maintenance, *occupancy*, operation, *use*, loading or *unloading of such vehicle* or craft *by any person*;
(3) Entrustment of such vehicle or craft by an "insured" to any person;
(4) *Failure to supervise or negligent supervision of any person involving such vehicle* or craft *by an "insured"*; or
(5) Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft. (Emphasis added.)

b. For the purpose of this definition:

(4) Motor vehicle means a "motor vehicle" as defined in **7.** Below.

7. "Motor vehicle" means:

a. A self-propelled land or amphibious vehicle[.]

8. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period, in:

a. "Bodily Injury;" or
b. "Property damage."

**SECTION II – EXCLUSIONS**
This insurance will not provide coverage or payments for indemnity or expense costs under any part of the policy for any "occurrence" arising wholly or in part, out of or in connection with the following activities excluded in paragraphs **A**. through **G**.[3]

Exclusions should be interpreted as excluding negligence arising from or resulting in the excluded loss, including, but not limited to, the negligent hiring, employment, placement, training, supervision, investigation, reporting to the proper authorities, or failure to so report, retention of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraphs **A**. through **G.**

**A.** "Motor Vehicle Liability"
   1. Coverages E and F do not apply to any "motor vehicle liability" if, at the time and place of an "occurrence," the involved "motor vehicle:"[4]
   a. Is registered for use on public roads or property;

**B.** "Watercraft Liability"
**C.** "Aircraft Liability" or "Drone Liability"
**D.** "Hovercraft Liability"
**E.** Coverage E - Personal Liability and Coverage; F-Medical Payments to Others
**F.** Coverage E – Personal Liability
**G.** Coverage F – Medical Payments to Others

On February 11, 2021, Ms. Calderon filed a cross-motion, Motion for Partial Summary Judgment on the Issue of Insurance Coverage, countering UPC's assertion that the homeowners' policy "Motor Vehicle Liability" exclusion precludes coverage for plaintiff's damages that arose from the October 4, 2019 incident. In her motion, Ms. Calderon averred that pursuant to La. C.C.P. art. 966(E), the issue of insurance coverage under FSIC's policy should be resolved in favor of Ms. Calderon because Suly and Lezly are both insureds under the policy, their negligent acts

---

[3] Under the Special Provisions – Louisiana, endorsements were added to the homeowners' policy, which changes some of the terms of the policy. These introductory paragraphs were incorporated into Section II – Exclusions provision in the amendment to the policy.
[4] On its declaration page, under the "Coverages" section, Section II – Liability Coverage, $300,000 is listed for the coverage limit for "E. Personal Liability" and $5,000 is listed for the coverage limit for "F. Medical Payments to Others."

occurred and Avril died on the premises insured by the policy, and the failure to supervise claims did not arise out of the "use" of the vehicle.

On May 7, 2021 the trial court conducted a hearing on the cross-motions for summary judgment and on May 12, 2021 rendered its judgment granting Ms. Calderon's Motion for Partial Summary Judgment on the Issue of Insurance Coverage, which determined that the homeowners' policy issued by UPC provides indemnity coverage for Avril's death and denying UPC's Motion for Summary Judgment. Accordingly, UPC timely sought the instant devolutive appeal seeking review of the May 12, 2021 judgment.

**Standard of Review**

"The denial of a motion for summary judgment is an interlocutory judgment and is appealable only when expressly provided by law. However, where, as here, there are cross-motions for summary judgment raising the same issues, this Court will review the denial of a summary judgment in addressing the appeal of the granting of the cross-motion for summary judgment." *Asi Fed. Credit Union v. Certain Underwriters at Lloyd's of London Syndicate 1414 Subscribing to Policy FINFR1503374*, 18-164 (La. App. 5 Cir. 11/7/18), 259 So.3d 552, 555 n.1 (citing *Waterworks Dist. No. 1 of DeSoto Parish v. La. Dep't. of Pub. Safety & Corr.*, 16-0744 (La. App. 1 Cir. 2/17/17), 214 So.3d 1, 3 n.1, *writ denied*, 17-0470 (La. 5/12/17), 219 So.3d 1103). See also *Marseilles Homeowners Condo Ass'n v. Broadmoor, LLC*, 12-1233 (La. App. 4 Cir. 2/27/13), 111 So.3d 1099, 1103 n.2, *Ferguson v. Bocskov*, 07-924 (La. App. 5 Cir. 3/25/08), 983 So.2d 162, 164.[5]

---

[5] See *Short v. Ochello*, 01-1358 (La. App. 5 Cir. 2/26/02), 811 So.2d 1009, 1010 (holding that "the denial of a motion for summary judgment is not a final, appealable judgment, the designation by the trial court notwithstanding."). The trial court's granting of Ms. Calderon's motion for summary judgment necessitated the denial of UPC's motion. Thus, in reviewing the granting of summary judgment in favor of Ms. Calderon on appeal, we unavoidably consider the basis upon which UPC's motion for summary judgment was denied. Further, an interlocutory judgment, such as the denial of a summary judgment, may be considered upon review of the final judgment. *Occidental Props. Ltd. v. Zufle*, 14-494 (La. App. 5 Cir. 11/25/14), 165 So.3d 124, 130 n.10, *writ denied*, 14-2685 (La. 4/10/15), 163 So.3d 809.

Appellate courts review summary judgments *de novo*, using the same criteria that govern the district court's consideration of whether summary judgment is appropriate. *Louque v. Scott Equip. Co., LLC*, 16-507 (La. App. 5 Cir. 2/8/17), 212 So.3d 1203, 1207, *writ denied*, 17-00372 (La. 4/13/17), 218 So.3d 629. A *de novo* review or an appeal *de novo* is an appeal in which the appellate court uses the trial court's record, but reviews the evidence and law without deference to the trial court's rulings. *Taylor v. Chipotle Mexican Grill, Inc.*, 18-238 (La. App. 5 Cir. 12/27/18), 263 So.3d 910, 913, *writ denied*, 19-0154 (La. 4/8/19), 267 So.3d 606. Thus, appellate courts ask the same questions as the trial court in determining whether summary judgment is appropriate: whether there is any genuine issue of material fact, and whether the mover-appellant is entitled to judgment as a matter of law. *Louque, supra.*

**Law and Discussion**

The crux of this appeal is whether, as a matter of law, based on the record, coverage for Suly's and Lezly's alleged acts of negligence is excluded by the Motor Vehicle Liability exclusion in UPC's policy.[6]

On appeal, UPC avers that the trial court erred in ruling that UPC's homeowners' policy affords coverage for Avril's death when the language of the policy unambiguously excludes coverage for an incident arising out of the (1) occupancy, (2) unloading, and (3) use of a vehicle. It further contends that the trial court erred in its determination that Avril's death did not arise out of a failure to supervise or negligent supervision involving a vehicle.

***Summary Judgment***

Whether an insurance policy provides or precludes coverage is a dispute that can be properly resolved within the framework of a motion for summary judgment.

---

[6] A party seeking recovery under an insurance contract must be a named insured, additional insured, or a third party beneficiary of the contract. *Ledet v. FabianMartins Construction LLC*, 18-133 (La. App. 5 Cir. 10/17/18), 258 So.3d 1058, 1066. While Lezly is not listed on the policy as a named insured, UPC has submitted that she may qualify as an insured under the policy since she resides on the insured premises.

*Love v. Sirey*, 12-823 (La. App. 5 Cir. 5/30/13), 119 So.3d 732, 736. A summary judgment may be rendered on the issue of insurance coverage alone, although there may remain a genuine issue as to liability or the amount of damages. *See* La. C.C.P. art. 966(E).[7] Summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. *Reynolds v. Select Properties, Ltd.*, 93-1480 (La. 4/11/94), 634 So.2d 1180, 1183.

### *Interpretation of Insurance Contracts*

The interpretation of an insurance policy is usually a legal question that can be properly resolved on a motion for summary judgment. *Bonin v. Westport Ins. Corp.*, 05-886 (La. 05/17/06), 930 So.2d 906, 910. A summary judgment declaring lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence, under which coverage could be afforded. *Reynolds*, 634 So.2d at 1183.

An insurance policy is a contract between the parties and should be construed using the general rules of interpretation of contracts. *Sims v. Mulhearn Funeral Home, Inc.*, 07-54 (La. 05/22/07), 956 So.2d 583, 589. The responsibility of the judiciary in interpreting insurance contracts is to determine the parties' common intent. *Id.*; La. C.C. art. 2045. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. Words and phrases in an insurance policy are to be construed using their plain, ordinary, and generally prevailing meaning, unless the words have acquired a technical meaning. *Geovera Specialty Ins. Co. v.*

---

[7] La. C.C.P. art. 966(E), provides: "a summary judgment may be rendered dispositive of a particular issue, theory of recovery, cause of action, or defense, in favor of one or more parties, even though the granting of the summary judgment does not dispose of the entire case as to that party or parties."

*Hernandez*, 18-330 (La. App. 5 Cir. 12/19/18), 262 So.3d 463, 467; La. C.C. art. 2047. Therefore, if the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written. *LeBlanc v. Aysenne*, 05-297 (La. 01/19/06), 921 So.2d 85, 89.

The words of a contract must be given their generally prevailing meaning. La. C.C. art. 2047. Words susceptible of different meanings must be interpreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050.

An insurer has the burden of proving that a loss comes within a policy exclusion. *Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1252 (La. 1993). Additionally, an exclusionary clause in an insurance policy must be strictly construed. *Calogero v. Safeway Ins. Co. of La.*, 99-1625 (La. 1/19/00), 753 So.2d 170, 173. However, an insurance policy, including its exclusions, should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. *Motorola, Inc. v. Associated Indem. Corp.*, 02-0716 (La. App. 1 Cir. 6/25/04), 878 So.2d 824, 829, *writ denied*, 04-2314 (La. 11/19/04), 888 So.2d 207, and *writ denied sub nom. Motorola, Inc. v. Associated Indemn. Corp.*, 04-2323 (La. 11/19/04), 888 So.2d 211, and *writ denied*, 04-2326 (La. 11/19/04), 888 So.2d 212, and *writ denied*, 04-2327 (La. 11/19/04), 888 So.2d 212.

### UPC's Motor Vehicle Liability Exclusion

At the outset, we point out that, on appeal and before the trial court, Ms. Calderon does not argue that any specific language in the policy or the endorsements is ambiguous or allows for contradictory interpretations.  Upon *de novo* review, we

find that the Motor Vehicle Liability exclusion under the homeowners' policy is unambiguous and should be applied as written. The policy contains a very specific list of liability losses or exclusions that are not covered, one of which is the Motor Vehicle Liability exclusion. Coverage or exclusion from coverage is triggered upon the occurrence of bodily injury and/or property damage. Further, the Motor Vehicle Liability exclusion of the homeowners' policy functions to broadly exclude coverage for bodily injury and property damage "arising out of the occupancy, use, unloading, and failure to supervise or negligent supervision." UPC clearly designed its policy exclusions to preclude all personal liability coverage arising from acts that involve a motor vehicle owned by an insured.

Specifically, under the Motor Vehicle Liability exclusion of UPC's policy, the exclusion is triggered when any one of the five delineated circumstances described in the policy occurs, which precludes recovery under the homeowners' policy.[8] Upon review of UPC's policy, there are five definitions, four of which have been triggered based on the facts of this case, of liability under the Motor Vehicle Liability exclusion that bars coverage. We now review each of the circumstances that UPC has asserted precludes coverage under the exclusion at issue in the instant matter.

In its first, second, and third assignments of error, UPC contends the trial court erred by finding its homeowners' policy affords coverage for Avril's death when the language of the policy unambiguously excludes coverage for an accident "arising out of the (1) use, (2) occupancy, or (3) unloading of the vehicle."

***"Arising Out Of Use"***

Ms. Calderon argues that Suly's and Lezly's liability arises from their breach of a custodial duty of care to protect Avril from injury, and not from Avril's "occupancy" or "use" of the vehicle. In support of her assertion, Ms. Calderon relies

---

[8] Under the Motor Vehicle Liability exclusion, the conjunction "or" is used to clearly preclude coverage if any of the specifically enumerated circumstances occurred.

on *Smith v. Estrade*, 589 So.2d 1158, 1161 (La. App. 5th Cir. 1991). Upon review, we find Ms. Calderon's contentions regarding *Smith* are misplaced. In *Smith*, we limited our review to whether an activity "arises out of the use" of an automobile under an automobile liability policy. *Id*. at 1160. We explained the long held jurisprudential rule: for an activity to arise out of the use of an automobile under an automobile policy, an insured's conduct must have been the legal cause of injury, and the insured's conduct must have been a use of the vehicle. *Id*. at 1161 (citing *Carter v. City Parish Government, Etc*., 423 So.2d 1080 (La. 1982), and *Kessler v. Amica Mut. Ins. Co*., 573 So.2d 476 (La. 1991)).[9] We further explained that "[t]o conclude that an injury arose out of the use of the automobile, a court must find the vehicle essential to the theory of liability. In this regard, a court should apply a common sense approach to determine whether the duty breached by the insured flows from the automobile's 'use' under the policy language." *Id*. In *Smith*, this Court held that a father's excessive shaking of his daughter in his automobile was an intentional, not negligent, act excluded from the automobile liability insurance coverage because, *inter alia*, the act was not within the foreseeable use of the automobile. *Id* at 1162.

### A. Duty

In the instant matter, relative to the first requirement in *Carter*, the duty to protect against the risk involved, Lezly had a duty to supervise Avril to prevent

---

[9] In *Carter*, the Louisiana Supreme Court addressed "arising-out-of-use" provisions in insurance contracts. The Supreme Court held that, when determining whether a particular claim arises out of the use of an automobile for insurance purposes, the examining court must answer two questions: 1) whether the insured's complained-of conduct was a legal cause of the injury, and 2) whether it was a use of the automobile. *Carter v. City Parish Government, Etc*., 423 So.2d 1080 (La. 1982). The Court explained that a duty-risk analysis is appropriate to decide the legal cause question rather than the traditional proximate cause concepts. *Id*. In *Kessler*, the Louisiana Supreme Court further addressed the question of whether the complained of conduct constitutes use of the vehicle when the operation of the vehicle was not involved. *Kessler v. Amica Mut. Ins. Co*., 573 So.2d 476 (La. 1991). It pointed out that it may be a much more difficult question than whether it was a legal cause of plaintiff's injury. *Id*. The Court explained that the only interpretation of "use" which would result in a finding that the conduct in that case was use of the vehicle is a holding that "use" may be interpreted to mean "while using." *Id*. Such an interpretation would extend the meaning of the arising-out-of-use provision of the policy beyond the contemplation of the parties to the contract and would not comport with the common-sense interpretation. *Id*.

injury to her and others. *See Arceneaux v. Arceneaux*, 13-511 (La. App. 3 Cir. 11/6/13), 127 So.3d 61, 65, *writ denied*, 13-2827 (La. 2/14/14), 132 So.3d 969 (holding it is well-settled that parents have a duty to supervise a child to prevent injury to the child and others); *Otwell v. State Farm Fire & Cas. Co.*, 40,142 (La. App. 2 Cir. 10/26/05), 914 So.2d 100, 106 (recognizing that parents have a general duty to supervise their minor children); *Mahlum v. Baker*, 25,876 (La. App. 2 Cir. 6/24/94), 639 So.2d 820, 824 (holding that parents and **other custodians** have a duty to supervise a child to prevent injury to the child and others). We agree with Ms. Calderon's assertion that as a custodian, Lezly had a general duty to supervise and protect Avril.

The record establishes that Lezly frequently babysat Avril, typically three days per week. In her deposition, Lezly testified that on those occasions when Avril stayed with her, she would stay overnight. Lezy would oversee Avril's care and basic needs during her stay at her apartment located at the rear of Suly's residence. Periodically, Avril would visit Suly and her husband while she was under Lezly's care. However, on the date of Avril's tragic death, Lezy testified that Avril was in her care and was to stay overnight at her apartment.

In addition to her general duty, we find that Lezly, as a custodian, also had a specific duty to protect Avril against the risks of harm that can arise out of the "use" of a motor vehicle by children **who are left in** or with access to **the vehicle** (Emphasis added). *See Mahlum*, *supra* (citing William Shelby McKenzie & H. Alston Johnson, III, 15 LOUISIANA CIVIL LAW TREATISE, Insurance Law and Practice § 72, at 186 (1986)). We point out that, upon review, no circuit within this state has addressed the issue of a child being left unattended by a parent or custodian in a hot vehicle. However, we find the specific duty discussed in *Mahlum, supra,* relative to parents' or custodians' specific duty instructional. In *Mahlum*, the Second Circuit Court of Appeal reasoned that the same approach applied by the *Carter* Court and

suggested by McKenzie and Johnson in their treatise, the "common sense" approach, was applicable to determining whether the operation or use of a motor vehicle is essential to the alleged breach of the specific duty. That court stated:

> Under this approach, most accidents resulting from the movement of a vehicle by an underaged child, either intentionally or accidentally, should be classified as arising out of "use" of the vehicle. Furthermore, any breach by the child's parents to prevent or supervise such a "use," will also be deemed to have arisen therefrom. However, this general rule should not be without exception. Each decision regarding whether the "use" of the automobile is an essential ingredient of the duty breached by the parents should be tempered by "common sense."

*Mahlum*, 639 So.2d at 825.

The record before this Court indicates that the complained-of-conduct was Avril remaining secured in her car seat in the rear of Suly's vehicle, and thereafter, being left unattended in the vehicle, which was unventilated and trapped heat, for several hours, which led to Avril sustaining injuries that caused her death. Based on the record before us, it is clear that Lezly breached both her general duty to supervise and her specific duty to protect Avril from the danger associated with abandoning a minor child in a vehicle under extreme heat conditions.

In addition, we recognize that under the circumstances presented in this case, Suly's duty differed from Lezy's duty to Avril. Lezly's duty to Avril was more akin to a babysitter caring for a minor child while Suly's duty to Avril is that of a host driver to her minor guest passenger. In *Salley v. State Farm Mut. Auto. Ins. Co.*, 157 So.2d 638, 641 (La. App. 2nd Cir. 1963), the Second Circuit explained the host driver's duty to minor guest passengers: "where the guest is a child, he [or she] is entitled to a greater degree of care than an adult in the same situation; in other words, the motorist, having undertaken to care for the child during the ride, is under a duty to take every reasonable precaution to prevent injury to him [or her]. 60 C.J.S. Motor Vehicles s 399(1), page 980." The *Salley* Court held that the host driver was

negligent when she devoted her undivided attention to the backing maneuver and failed to check and observe when her minor guest passenger, who was a child of tender years, fell out of the front seat of an automobile and was run over by that same vehicle as the driver made a backing and turning maneuver. *Id*.

In her deposition, Suly testified that she never supervised or babysat Avril and that only Lezy babysat the 2-year-old minor. She further stated that Avril would only stay at her residence during the period in which Avril's father, Eduardo, had lived with her.[10] Suly maintained that she never placed Avril in the car seat or removed her from the seat due to her continuous limited use of her hands because of arthritis, and that Eduardo, Lezy, or Jonathon would always secure and remove Avril in her car seat in Suly's vehicle. Thus, under the facts of this case, Suly's duty to Avril mirrored that of a host driver as discussed in *Salley*.

While Suly's duty to Avril was that of a host driver, Suly was still required to exercise a high degree of care while Avril was a passenger in her vehicle. In *Edwards*, the Louisiana Supreme Court held that "the host driver's duty to avoid placing the occupants of his [or her] vehicle in a dangerous predicament is enhanced when the passenger's age or situation increases the odds against the passenger's escaping the peril encountered." *Edwards v. Horstman*, 96-1403 (La. 2/25/97), 687 So.2d 1007, 1011. In that case, the Louisiana Supreme Court held that the host driver breached a legal duty to his guest passenger when he operated his vehicle without due regard for his guest passenger's safety and thereby exposed her to potential gunplay when the host driver purposefully drove his vehicle at a sufficient rate of speed so that it would remain within the range of the shotgun pointed at his vehicle by another motorist, which led to his guest passenger's injuries. *Id*. at 1011-12. Here, Suly transported Avril, who was a minor guest passenger in her vehicle, from

---

[10] At the time of Avril's death, Eduardo lived in Avondale and no longer resided with his mother at her residence.

Walgreens to Suly's residence. Upon arriving at her home, Suly parked her vehicle in the driveway and proceeded to enter her home without confirming with Lezly that she would remove Avril from the vehicle and without inspecting her vehicle to confirm that Lezly or Jonathon had actually taken the baby out of the car. Thus, Suly breached her duty as a host driver by failing to protect her minor guest passenger, Avril, from being placed in a dangerous predicament – being abandoned in a hot vehicle – by failing to confirm that Lezly or Jonathon was going to and then actually did remove Avril from the vehicle, because Avril was incapable of getting out of the vehicle independently at the tender age of 2-years-old.

Thus, both Suly's and Lezly's negligence was a legal cause of the accident in question when Suly and Lezly failed to exercise the required degree of caution and care toward Avril under the specific circumstances of this case. Both parties were negligent by failing to discover Avril's presence in the rear of the vehicle, and by abandoning Avril in a hot vehicle while she was restrained in a car seat.

### B. Use

As to the second requirement outlined in *Carter*, we address whether the alleged harm arose out of the "use" of the vehicle. To make that determination, we must inquire whether the use of the vehicle is essential to the theory of negligence asserted against Suly and Lezly. Upon *de novo* review, we find in her petition, Ms. Calderon asserted three grounds for liability: (1) failure to properly supervise or negligent supervision (*couched as inattention or distraction, failing to see what should have been seen, and failure to exercise due care*) of Avril; (2) negligent entrustment; and (3) failure to unload Avril from the vehicle.

On appeal, Ms. Calderon avers that the custodians' duty to supervise a child entrusted into their care does not flow from the vehicle. Rather, she maintains that the custodial duty is continuing in nature, and exists independently of the instrumentality that may result in harm. To support her proposition, Ms. Calderon

cites *Frazier v. State Farm Mut. Auto. Ins. Co.*, 347 So.2d 1275 (La. App. 1st Cir.), *writ denied*, 351 So.2d 165 (La. 1977); *Smith v. USAA Cas. Ins. Co.*, 532 So.2d 1171 (La. App. 4th Cir. 1988); and *Lejeune v. Allstate Ins. Co.*, 365 So.2d 471 (La. 1978), and other cases from various jurisdictions, to show that the duty existed independently of the use of the automobile and was incidental to that use. We decline to review cases from jurisdictions outside of this state, as there are several cases within our state that have addressed the issue of "use" in automobile exclusion provisions in determining whether coverage was applicable or excluded. More importantly, we disagree with Ms. Calderon's interpretation and find that her reliance on those cases is misplaced.

*Frazier*, *Smith*, and *Lejeune* involved general motor vehicle exclusions and did not contain the express policy language at issue in the present case, which is almost identical to the supervision exclusion found in *Madere*, where we highlighted the critical distinction between an express supervision exclusion precluding recovery and a general motor vehicle exclusion. *Madere v. Bellsouth Telecomm., Inc.*, 98-405 (La. App. 5 Cir. 5/13/98), 712 So.2d 266.[11] In *Madere*, we explained,

> None of the policies in those three cases [*Frazier*, *Smith*, *and Lejeune*] contained the policy exclusion for supervising persons with regard to the use of a motor vehicle. Those cases were decided on the motor vehicle exclusion only. Even if we accepted those cases as controlling as to the motor vehicle exclusion, the policy in the instant case contains an additional exclusion covering liability for supervision of a person.

---

[11] In *Madere*, *supra*, the homeowners' policy at issue, provided, in pertinent part:

> Coverage L [personal liability] and Coverage M [medical payments] do not apply to:
>
> e. bodily injury or property damage arising out of the ownership, maintenance, use, loading or unloading of:
> (2) a motor vehicle owned or operated by or rented or loaned to any insured;
>
> f. bodily injury or property damage arising out of:
> (2) the supervision by any insured of any person;

*Id*. at 267-68.

We further stated,

> *Frazier* and *LeJeune* are clearly distinguishable because in
> each case there was a separate and distinct theory of
> liability from that involving the use of a motor vehicle. In
> *Frazier*, the theory of liability was for negligent
> supervision of a small child who was struck by an
> automobile, not using one. In *LeJeune*, the theory of
> recovery was breach of law enforcement duties in
> directing traffic, not in using his vehicle. And *Smith*,…has
> been criticized by noted legal commentators, 15 William
> Shelby McKenzie & H. Alston Johnson, III, Louisiana
> Civil Law Treatise § 72 (1996), and, the reasoning therein,
> is contrary to the reasoning in the more recent Supreme
> Court case in *Picou v. Ferrara*, 412 So.2d 1297 (La.
> 1982).
>
> In *Picou*, the Supreme Court held that a claim against an
> employer for negligent hiring of an incompetent employee
> to drive a vehicle was excluded from coverage under the
> automobile exclusion of the employer's comprehensive
> general liability policy because use of the vehicle was
> essential to that theory of liability. In doing so, the court
> distinguished both *Frazier* and *LeJeune*, finding that in
> neither case was use of the vehicle an essential element in
> the theory of liability. In *Picou*, the court found that use of
> the vehicle was essential to the theory of liability and,
> therefore, covered by the exclusion.

*Madere*, 712 So.2d at 268. Moreover, since this Court's decision in *Madere*, the

Fourth Circuit Court of Appeal overruled its decision in *Smith*. *See Howell v. Ferry*

*Transp., Inc.*, 04-2057 (La. App. 4 Cir. 3/29/06), 929 So.2d 226, 231 (finding that

use of the vehicle was essential to the plaintiff's theory of liability and affirming the

trial court's grant of summary judgment in favor of the defendant-insurer). In

*Madere*, *supra*, we reversed the trial court's denial of an insurer's motion for

summary judgment on the basis that coverage was excluded under an express

supervision exclusion provision under the homeowners' policy. In that case, the

plaintiffs' son accompanied the defendant and his minor son to a crawfish boil near

the defendant's residential property, and the defendant brought an off-road

motorcycle with them to the event. *Id*. at 266-67. The plaintiffs' son, the passenger,

and the defendant's son, who was the driver of the off-road motorcycle, were struck by or rode into a steel support cable extending from a utility pole, which caused the plaintiffs' son to sustain injuries. *Id*. When the insurer filed its motion for summary judgment, plaintiffs asserted that the defendant was negligent in supervising his own son and plaintiffs' son and that the negligent supervision claim was not excluded under the policy because it was a separate and distinct claim from that involving the use of the vehicle. *Madere*, 712 So.2d at 267. This Court held that the use of the motor vehicle was an essential element to the theory of liability, and that the defendant was negligent in his supervision or lack of supervision of the two boys' use of the motor vehicle such that coverage was excluded by the provision in the homeowners' policy. *Id*. at 268.

Like the plaintiffs in *Madere*, in the instant matter, Ms. Calderon relied on *Frazier*, *Smith*, and *Lejeune*. For our reasons cited in *Madere*, we find that the express supervision exclusion contained in the homeowners' policy in this case to be distinct from the motor vehicle exclusion found in *Frazier*, *Smith*, and *Lejeune*. We further conclude that use of the vehicle in this case, as distinguished from the vehicle use in those three instances, is an essential element to the theory of liability – Lezly's and Suly's failure to supervise or negligent supervision of Avril involved use of the motor vehicle.

To conclude that an injury arose out of the use of the automobile, a court must find the vehicle essential to the theory of liability. *Lucey v. Harris*, 490 So.2d 416, 419 (La. App. 5th Cir.), *writ denied*, 496 So.2d 327 (La. 1986). In rare cases involving violent acts, this Court has determined that the injury did not arise out of the use of the vehicle. In *Lucey*, we evaluated the "arising-out-of-use" provision under an automobile liability policy when a decedent's widow sued a taxicab driver and his insurer for her husband's death after the taxicab's passenger shot him. *Id*. at 418. In that case, we affirmed the trial court's judgment granting summary judgment,

finding that the tortfeasor's use of the taxicab was only incidental to the injuries sustained by the decedent, and that the accident did not flow from the use of the vehicle within the meaning of the insurance policy. *Id*. at 421. We explained that the circuits within this state have consistently refused to extend the "arising-out-of-use" provision of the policies to instances that involved gunshots and physical attacks that occurred in a vehicle or in conjunction with the use of a vehicle and in which the issue was whether coverage existed under the respective automobile liability policies. *Id*. at 420.

In *Currera v. Loyd*, 531 So.2d 544 (La. App. 5th Cir. 1988), we applied the *Carter* test in a suit for damages for injuries sustained in the kidnapping, rape, and murder of the plaintiffs' three-year-old daughter. In that instance, we explained that the injuries suffered by the victim and her parents were caused by the defendant's violation of a criminal statute, and not by use of the truck, although the defendant may have used the truck to effect his getaway and may have raped the child in the truck. *Id*. at 546. As in *Lucey*, in *Currera,* this Court applied a common sense approach to determine whether the duty breached by the insured flows from the automobile's "use" under the policy language. *Id*. at 545-46. Since the tortfeasor's criminal conduct did not flow from the use of the vehicle, we affirmed the trial court's dismissal of the insurer on summary judgment. *Id*.

Moreover, Louisiana jurisprudence has given a broad interpretation to the words "arising out of the ... use of the automobile." *Ursin v. Webb*, 06-280 (La. App. 5 Cir. 9/26/06), 945 So.2d 734, 736, *writ denied*, 06-2580 (La. 1/12/07), 948 So.2d 152; citing *U.S. Fidelity v. Burris*, 240 So.2d 408, 409 (La. App. 2nd Cir. 1970). The totality of the circumstances surrounding or leading up to an accident should be examined in determining if the accident arose out of the "use" of the automobile. *Id*. By looking to what part the automobile played in the entire scheme, the courts can determine if there is coverage, and if so, how far it will be extended. *Id*. Each case

must depend on its facts according to the part the automobile played in the scheme. *Id.*

In the matter *sub judice*, Avril's injuries occurred while the vehicle was used for a purpose inherent to vehicles, that is, to transport persons or things from one location to another. Specifically, Avril was transported in Suly's vehicle from Walgreens in Metairie to her paternal aunt's and grandmother's home in Destrehan. While the vehicle was no longer being operated when Avril was left unattended, it is well established that one need not be actually operating or driving a vehicle in order to be using it. *Ursin*, 945 So.2d at 736. The purpose for which Avril was in the vehicle had not been fully accomplished – that is, to ultimately be with and under the care of her paternal aunt inside the residence at 494 Carolyn Drive.

Furthermore, the vehicle caused the conditions that produced the injury. Because Avril was left in a hot vehicle that was unventilated, the vehicle was not merely the situs of the injury. The vehicle was the catalyst for the heat-chamber-like conditions that arose which may not have occurred without the vehicle. In addition, the danger associated with leaving a child who has been locked into a car seat in a vehicle during extreme heat is well-known by any reasonable, prudent adult. Vehicles have long been recognized for trapping heat, especially when the vehicle is idle and the ignition is off. Therefore, but for Avril being placed in the rear of the vehicle to be transported to Suly's and Lezly's residence, she would not have been injured.

Considering our jurisprudence relative to the arising-out-of-use provision, as discussed above, the legal cause of the accident in question arose out of the use of the vehicle when Suly and Lezly failed to exercise the required degree of caution and care towards Avril. We further find that Avril's injuries arose from the use of the vehicle since she was restrained in her car seat in the rear of Suly's vehicle for the purpose of being transported. Suly's and Lezly's breach of their duties flows

from the use of the vehicle when Avril was left unattended in the hot vehicle for several hours. The use of the vehicle is a common and essential element in the theory of liability for the claims of failure to unload and supervise, which is more fully discussed hereinbelow. In light of the forgoing, Ms. Calderon's assertion lacks merit.

*"Arising Out of Occupancy"*

Ms. Calderon avers that Suly's and Lezly's liability arises from their breach of a duty of care to protect Avril from injury such that occupancy in the car alone is insufficient to trigger the exclusion and that the underlying liability must arise out of that occupancy. To bolster her contention, Ms. Calderon again references *Smith v. Estrade*, which she argues stands for the proposition that a breach of a parental [or custodial] duty of care exists independent of and incidental to the vehicle. There the defendant, who was the father of the minor passenger, shook his daughter to death while both were occupants of a vehicle that he was operating.

UPC concedes that occupancy is not defined in the policy, and that the generally prevailing meaning of occupancy should be applied in this instance. UPC maintains that Ms. Calderon has not denied that Avril was in fact an occupant of the vehicle at the time of her injuries, and that it is undisputed that Suly's and Lezly's alleged liability arose out of Avril's occupancy of the car.

Where, as here, the term "occupancy" is undefined in the homeowners' policy, the general rule of applying the ordinary, plain and usual meaning of the phrase and its terms is appropriate because the failure to define the term does not necessarily render the provision ambiguous. *Power v. State Farm Fire & Cas. Co.*, 15-796 (La. App. 5 Cir. 5/26/16), 193 So.3d 471, 475. Accordingly, the plain meaning of "occupancy" refers to "the act, state, or condition of holding, possessing, or residing in or on something." *Black's Law Dictionary*, 10th Ed. 2014. Applying the ordinary, plain, and usual meaning of the term at issue, we find that Avril was "occupying" or "in" the vehicle under the facts of this case, and that the Motor Vehicle Liability

exclusion creates no ambiguity with respect to the coverage or lack of coverage contemplated by the homeowner's policy. Thus, we find that Avril was occupying the vehicle for purposes of the exclusion, and that coverage under the homeowners' policy is excluded under the circumstances presented in this case.

*"Arising Out of Unloading"*

UPC contends that because the term "unloading" is not defined in its homeowners' policy, the trial court erred by failing to appreciate the distinction between the terms "use" and "unloading," and in finding that the alleged liability for Avril's death did not arise out of the unloading of the vehicle. UPC asserts that the term "unloading" should be defined, like "occupancy," by its generally prevailing meaning in this instance.

On the other hand, relying on *Barrios v. Service Drayage Co.*, 250 So.2d 135, 142 (La. App. 4 Cir.), *writ denied*, 253 So.2d 66 (La. 1971), Ms. Calderon maintains that Louisiana jurisprudence defines "unloading and loading" as…being moved onto or off of the vehicle. We agree.

Further, in *Barrios*, the Fourth Circuit explained that to prevent absurd results by applying various interpretations used throughout Louisiana circuits, the appropriate rule to be applied in Louisiana is stated in the *Fertitta* case, which sets forth the test for "unloading" under insurance contracts. *Id*. at 143. The test for coverage under an "unloading" clause is whether, under the particular facts involved, the act causing the injury constituted a part of the "unloading" process as that term is commonly understood. *Copes v. Copeland Bldg. Supply, Inc.*, 415 So.2d 264, 266 (La. App. 2nd Cir. 1982) (citing *Fertitta v. Palmer*, 252 La. 336, 211 So.2d 282, 285 (La. 1968) (holding that the "common sense" approach is applicable when the court should decide whether, under a particular set of facts, the act causing the injury constituted a part of the "unloading" process as that term is commonly

understood)).[12] Coverage is not precluded by the passage of time between the unloading and the injury. *Id.* at 267. The coverage applies to injuries "arising out of the ... unloading ..." of the vehicles. *Id.* It is not required that the injury be contemporaneous with the unloading. *Id.* In *Copes*, the Second Circuit held that the negligent act, the stacking of sheetrock, was a part of the unloading, even though that negligence did not cause injury until two to ten hours later, the injury still arose out of the negligence in the unloading. *Id.* *See also Ursin*, 945 So.2d at 738 (holding that liability arose out of the "use" of the vehicle, where the driver mistakenly pushed the wrong button to close the wrong loading-bay door when unloaded his truck in Winn Dixie's warehouse, causing the door to hit the plaintiff).

Here, where the term "unloading" is undefined in the homeowners' policy, as previously discussed, the general rule of applying the ordinary, plain and usual meaning of the phrase and its terms is appropriate because the failure to define the term does not necessarily render the provision ambiguous. *Power*, 193 So.3d at 475. Applying the definition of "unloading" as stated in *Barrios* to the instant matter, we find Lezly's and Suly's failure to unload or remove Avril from the vehicle is within the scope of the common understanding of unloading under the facts of this case. Thus, the term "unloading" in the Motor Vehicle Liability exclusion of the homeowners' policy is not ambiguous.

Ms. Calderon further argues that there is no evidence that Avril received her fatal injury while being unloaded from a vehicle. We find that Ms. Calderon misinterprets the standard set forth in *Copes* and *Fertitta* to determine whether the exclusion applies to injuries arising out of the unloading of a vehicle.

Applying the common sense approach outlined in *Copes* and *Fertitta* to the instant matter, Lezly's and Suly's negligence in failing to unload Avril from the

---

[12] In *Fertitta*, *supra*, the Supreme Court explained that whether the negligent employee was in the process of unloading the truck or installing the sign at the time the accident occurred was the appropriate consideration when determining if the accident arose out of the unloading of a vehicle.

vehicle caused Avril to sustain fatal injuries after being left unattended in the rear of the vehicle for several hours. As in *Copes*, while Avril's injury was inflicted over the course of several hours, her injuries still arose out of the defendants' negligence in failing to unload her from the vehicle. The activity of unloading is relevant and crucial in the case at bar because Lezly, upon arriving to the residence in Destrehan, exited the vehicle and proceeded to unload bags, with the assistance of her then boyfriend Jonathon, from the vehicle. She failed, however, to unload Avril or inspect the vehicle to confirm that Avril was no longer inside the car. Suly also failed, after exiting the vehicle and prior to entering the house, to confirm that Lezly or Jonathon would remove Avril from the car or to check to make sure that they had. The negligent act of leaving Avril unattended in a hot vehicle was a part of the unloading. Accordingly, the Motor Vehicle Liability exclusion was triggered as to Avril's heat injury and death arising out of Lezy's and Suly's failure to unload Avril from the vehicle.

**"Arising Out of Failure to Supervise/Negligent Supervision"**

Lastly, UPC contends that the trial court erred in its determination that Avril's death did not arise out of a failure to supervise or negligent supervision involving a vehicle. During the summary judgment hearing the trial court found the phrase "involving such vehicle" in the exclusion to be ambiguous as to the meaning of "involving." As previously discussed, the Motor Vehicle Liability exclusion under the homeowners' policy is unambiguous and should be applied as written. UPC clearly designed its homeowners' policy exclusions to preclude all personal liability coverage arising from acts that involve a motor vehicle owned by an insured. The exclusion does not conflict with any statutory provisions or public policy and therefore is enforceable as written.[13] As also discussed above, Ms. Calderon has not

---

[13] Subject to the above rules of interpretation, insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy.

alleged that any specific language of UPC's exclusion or in the policy or the endorsements is ambiguous or allows for contradictory interpretations. Accordingly, we find that the trial court erred in its determination that the term "involving" was ambiguous.

Relative to the exclusion for failure to supervise or negligent supervision, Ms. Calderon maintains that the facts and legal issues in this case mirror the situation in *Frazier*, and that the homeowners' policy exclusion does not encompass negligent supervision for the six hours during which Avril was left in the car. We find that *Frazier* is distinguishable from the instant case. As discussed previously, in *Frazier*, there were separate and distinct theories of liability: one theory being that the insureds, as homeowners, were negligently supervising the child they were babysitting, who, as a result, was struck by a vehicle; the other theory being that the insureds were liable under their auto policy because their vehicle, while being driven by their daughter, struck the child. In other words, in *Frazier*, "use" of the vehicle was not essential to the negligent supervision theory of liability. Louisiana law is clear that in order for homeowners' liability coverage to apply to negligent entrustment and supervision claims, the "operation" or "use" of a motor vehicle must not be essential to the asserted theory of liability. See *Otwell*, 914 So.2d at 106; *Oaks v. Dupuy*, 26,729 (La. App. 2 Cir. 04/05/95), 653 So.2d 165, 167-68, *writ denied*, 95-1145 (La. 06/16/95), 655 So.2d 335; *Mahlum*, 639 So.2d at 826-27; and *Simmons v. Weiymann*, 05-1128 (La. App. 1st Cir. 08/23/06), 943 So.2d 423, 426-28. Here, unlike *Frazier*, "use" of the vehicle is inextricably intertwined with plaintiff's negligent supervision theory of liability.

As averred by UPC, the facts and issues present in this case are analogous to *Chreene v. Prince*, 52,351 (La. App. 2 Cir. 9/26/18), 256 So.3d 501. In *Chreene*,

---

*Geovera*, 262 So.3d at 468 (citing *Reynolds v. Select Properties, Ltd*., 93-1480 (La. 4/11/94), 634 So.2d 1180, 1183).

the plaintiffs, as in the present case, argued that the motor vehicle exclusion under the policy did not apply because the use of the vehicle was not essential to the theory of liability - negligent supervision. *Id*. at 506. The plaintiffs in *Chreene* sought damages from their son's employer and his insurers for his death. *Id*. at 504. In that case, their son became intoxicated after consuming alcohol at a camp where he resided while employed at a zip line park, drove a borrowed vehicle, missed a curve, left the roadway, and was killed in a single-car accident. *Id*. The employers' homeowners' insurer filed a Motion for Summary Judgment on the basis that coverage for the liability asserted against the employer was precluded under the motor vehicle exclusion. *Id*. at 505. The motor vehicle exclusion in *Chreene* mirrors the language of the Motor Vehicle Liability exclusion under UPC's policy. In that case, the plaintiffs, just as the plaintiff in this case, relied on *Frazier* to support their assertion that the exclusion does not apply because the negligent supervision claim was not essential to their theory of liability against the defendant. *Id*. at 507. The Second Circuit held that the facts in *Chreene* were distinguishable from those of *Frazier*, specifically:

> … [H]ere, the policy expands the motor vehicle exclusion incorporated in its policy beyond operation or use, and even negligent entrustment, of a motor vehicle. The policy specifically contains a provision that excludes coverage for liability arising out of the "failure to supervise or negligent supervision of any person involving such vehicle or craft by an 'insured.' " The language of this provision in the policy is clear and explicit and obviously intended to apply to the very circumstances that are alleged by Plaintiffs in their suit against Prince - negligent supervision. While we recognize that exclusionary provisions are to be strictly construed against the insured, there is simply no ambiguity present in this provision in the policy that would allow it to be construed in Plaintiffs' favor. Likewise, the enforcement of the provision as written would not lead to any absurd consequences. The policy clearly excludes coverage for any liability Prince may be found to have for Austin's death because such liability arises out of Austin's use or operation of a motor vehicle and/or out of Prince's ***failure to supervise or***

> *negligent supervision of* Austin *involving a motor vehicle*.

*Id*. at 507 (emphasis added).

As in *Chreene*, we find no ambiguity in UPC's Motor Vehicle Liability exclusion under the homeowners' policy. While we are empathic towards the parties regarding the tragic incident that led to Avril's death, we cannot say that this homeowners' policy and the exclusion at issue would lead to absurd consequences or that it is contrary to public policy.

**DECREE**

In conclusion, upon *de novo* review of defendants' motion for summary judgment and plaintiff's cross-motion for partial summary judgment, for the foregoing reasons, we find that there are no genuine issues of material fact and that defendants are entitled to judgment as a matter of law. Accordingly, we find that the trial court erred in its May 18, 2021 judgment denying UPC's Motion for Summary Judgment and in granting Ms. Calderon's cross-motion for Partial Summary Judgment on the Issue of Insurance Coverage. Thus, the May 18, 2021 judgment relative to the cross-motions for summary judgment is hereby reversed, UPC's Motion for Summary Judgment is granted, and Ms. Calderon's Motion for Partial Summary Judgment on the Issue of Coverage is denied. This matter is remanded to the district court for further proceedings.

**REVERSED AND REMANDED**.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN S. BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **MAY 4, 2022** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 21-CA-579

**E-NOTIFIED**

29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE M. LAUREN LEMMON (DISTRICT JUDGE)
H. MINOR PIPES, III (APPELLANT)      JAMES A. PRATHER (APPELLANT)      KATHERINE S. ROTH (APPELLANT)
PEDRO F. GALEAS (APPELLEE)           SCOTT LABARRE (APPELLEE)          STEVEN F. GRIFFITH, SR. (APPELLEE)
JAMES L. DONOVAN, JR. (APPELLEE)

**MAILED**

ALEXIS POLK JOACHIM (APPELLANT)      ROBERT C. JENKINS, JR. (APPELLEE)      C. BOWMAN FETZER, JR. (APPELLANT)
ATTORNEY AT LAW                      ATTORNEY AT LAW                        ATTORNEY AT LAW
1100 POYDRAS STREET                  631 ST. CHARLES AVENUE                 THREE SANCTUARY BOULEVARD
SUITE 1800                           NEW ORLEANS, LA 70130                  THIRD FLOOR
NEW ORLEANS, LA 70163                                                       MANDEVILLE, LA 70471